UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

MONTPELIER US INSURANCE COMPANY
and MESA UNDERWRITERS SPECIALTY
INSURANCE COMPANY, a foreign
corporation,

           Plaintiff,

vs.

PORTOFINO OF ST. AUGUSTINE, LLC;
JOHNSON-GRAHAM-MALONE, INC.; OLD
TOWN VILLAGES CONDOMINIUM
ASSOCIATION, INC.; A.J. JOHNS, INC.;
BRADCORP FLORIDA II, LLC; BUILDER
SERVICES GROUP, INC.; HWZ, LLC f/k/a
HOGE-WARREN-ZIMMERMAN CO.; JLH
ELECTRIC SERVICES, LLC; STRANGE
LATHING & PLASTERING, INC.; and
STANLEY SMITH DRYWALL, INC.,

           Defendants.

_____/

CASE NO. 3:18-cv-01530-TJC-JRK

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

Mesa Underwriters Specialty Insurance Company ("Mesa") and Montpelier US Insurance Company ("Montpelier," collectively "Plaintiffs") pursuant to Fed. R. Civ. P. 56(a) move for summary judgment as follows:

### Relief Sought

The Plaintiffs contracted with Portofino of St. Augustine LLC ("Portofino") to insure solely those units owned by Portofino after the construction of certain condominiums were completed. In the underlying action, the Association is seeking to hold Portofino liable not as a unit owner but for the development and construction of the condominium project. The relevant policy endorsements are clear and unequivocal regarding the insurance provided – namely that

coverage was limited to Portofino as an owner and to only certain designated areas. Accordingly the Plaintiffs are entitled to the entry of summary judgment.

## STATEMENT OF MATERIAL FACTS

### I.      Parties to the Instant Action

1.      On December 31, 2018, Plaintiffs filed this action.  (Doc. 1). Plaintiffs amended the complaint on January 30, 2019 ("Amended Complaint").   (Doc. 14). In the Amended Complaint, Plaintiffs sued Portofino, the named insured in the Mesa policy, Old Town Villages Condominium Association, Inc. ("Association"), the claimant in the Underlying Action, Johnson-Graham-Malone, Inc. ("JGM"), the general contractor Portofino hired to build the project and A.J. Johns, Inc. ("A.J. Johns")[1], Bradcorp Florida II, LLC ("Bradcorp"), Buider Services Group, Inc. ("Builder Services"), HWC, LLC f/k/a Hoge-warren-Zimmerman Co. ("HWZ"), JLH Electric Services, LLC ("JLH Electric"), Strange Lathing & Plastering, Inc. ("Strange Lathing") and Stanley Smith Drywall, Inc. ("Stanley Smith,") collectively the "Subcontractors") as defendants as the Subcontractors signed contracts requiring them to defend and indemnify Portofino. (Doc. 14 at ¶¶28, 38-40.)[2]

### II.     Underlying Action

2.      On November 25, 2015, the Association filed a Complaint in the Circuit Court in and for St. Johns County (" Part One Underlying Complaint"). (Doc. 14-2 at pgs. 1-125). On January 15, 2018, the Association filed its Amended Complaint which added JLH, as well as others, as parties to the litigation by interlineation ("Underlying Amended Complaint,"

---

[1] AJ Johns has been dismissed as a party to the action. (Doc. 91 at pg. 10, ¶4).
[2] Portofino, JLH and Strange Lathing have been defaulted. (Docs. 33, 37 and 59),

collectively with the Part One Underlying Complaint "Underlying Complaint"). (Doc. 14-2 at pgs. 126-173).[3]

3.      The Association sued Portofino based  on alleged defects in the construction of the Project under four theories: breach of Fla. Stat. §718.203(1) statutory warranties (Count I); breach of duties under declaration (Count III); violations by the directors pursuant to §718.303(1) (Count IV), violations of the Florida Building Code Act (Count V),  and violation of the building code. (Doc. 14-1, at pgs. 67-69, 72-74, 74-78, 78- 80 and ¶¶151-168).

*Construction of the Project*

4.      The Underlying Complaint alleges Portofino acquired the subject land on December 17, 2004. (Doc. 14-2 at pgs. 56, 142, ¶¶71, 247).

5.      The Underlying Complaint alleges Portofino retained the services of JGM to act as general contractor as evidenced by the contract executed by Portofino and JGM ("Master Agreement"). (Doc. 14-2 at pgs. 56, 143, ¶¶77, 253; Doc. 14-3).

6.      The Underlying Complaint alleges that the condominium consists of common elements and units. (Doc. 14-2 at pgs. 56, ¶¶78, 254; Doc. 14-3).

7.      The Underlying Complaint alleges that all four phases of the Project were substantially completed and a certificate of occupancy was issued for the last building on or about April 26, 2007. (Doc. 14-2 at pgs. 57, ¶¶85, 261; Doc. 14-3).

8.      The Initial Master Agreement designated the scope of construction as "Portofino Condominiums" located on State Road 16 in St. Augustine, Florida. (Doc. 14-3 at pg. 3).

---

[3] The Underlying Amended Complaint contains a footnote that states: "[t]his pleading adds additional defendants to the above-style action pursuant to the operative Case Management Order. The prior Complaint filed on November 25, 2015…stands over as to parties named therein. The numbering of this pleading continues from the Original Complaint. In addition, Count V is amended by interlineation."  (Doc. 14-2 at pgs. 126, fn. 1).

Subsequent to the execution of the initial Master Agreement, Portofino and JGM executed additional agreements that designated the scope of construction as "Portofino/Old Town Villages Condominiums" located at 2083 SR 16 St. Augustine, FL. (the Initial Master Agreement as well as all amendments are collectively the "Master Agreement") (Doc. 14-3 at pg. 56; Doc 14-4 at pg. 14).

9.      Section 3.18 of the Master Agreement is entitled "Indemnification." The indemnification section of the Master Agreement requires any subcontractor hired to perform work at the Project to indemnify Portofino. The indemnification provision also includes a requirement for the reimbursement of any attorney's fees incurred by Portofino.

10.     The Subcontractors, or their related entity, all contracted with JGM and participated in construction of the Project ("Subcontracts"). (Doc. 14-2 at pgs. 9, 12, 17, 23, 36, 38, 136, ¶¶32, 35, 38, 49, 50, 84 and 237); (Doc. 14-6 at pgs. 32, 14-7 at pg. 35, 77, 110, 14-8 at pgs. 10, 31, 63, 96, 14-9 at pgs. 9, 42, 75, 95 and 14-10 at pgs. 14, 57).[4]

11.     The first paragraph of each of the Subcontracts states  that the Master Agreement is "expressly incorporated by reference." (Doc. 14-6 at pgs. 38; 14-7 at pgs. 38, 80, 113; Doc. 14-8 at pgs. 34, 66, 99; Doc. 14-9 at 12, 45, 78, 98). Further, paragraph 2 of the Subcontracts contain the following reference to the Master Agreement:

> "Subcontractor agrees to be bound to [JGM] by the requirements, terms and conditions applicable to [JGM] under the [Master Agreement] between [JGM] and [Portofino].

(Doc. 14-6 at pgs. 39; 14-7 at pgs. 38, 80, 113; Doc. 14-8 at pgs. 34, 66, 99; Doc. 14-9 at pgs. 12, 45, 78, 98

12.     The Subcontracts also contain the following language regarding insurance:

---

[4] The Subcontracts with JLH for Phase I and Phase II appear to have been inadvertently attached twice. The duplicates begin at Doc. 14-9, at pgs. 131 and continue through Doc. 14-10.

> "Additional insured endorsement: The Bodily Injury and Property Damage Liability policies shall include a provision or endorsement naming both [Portofino] and [JGM] and their officers and employees as additional insured with respect to liabilities arising out of the Subcontractor's performance of the work under this Contract…"

(Doc. 14-7 at pgs. 48; 90; 14-8 at pgs. 10, 44, 76, 109; Doc 14-9 at pgs. 21, 55, 88, 103

13.     Further, the Subcontracts included requirements for the Subcontractors to indemnify JGM and hold it harmless. (Doc. 14-7 at pg. 48, ¶64; Doc. 14-8 at pgs. 10, 44, 76, 109; Doc. 14-9 at pgs. 21, 55, 88, 103

14.     Construction was completed by April 26, 2007, as evidenced by the issuance of the last certificate of occupancy. (Doc. 14-2 at pgs. 58, 144,¶¶85, 261).

### Creation of the Association

15.     Portofino created the Association on June 21, 2006 (Doc. 14-2 at pgs. 57, 142, ¶¶73, 75, 249, 251). Portofino began submitting the Project to condominium ownership on October 12, 2006 when it filed the Declaration of Condominium. A true and correct certified copy of the Declaration of Condominium is attached as **Composite Exhibit "A."**[5]

16.     The Declaration states that Portofino submitted certain described real property "to the condominium form of ownership in the manner provided for" in the Florida Statutes. *See* Ex. **A**, at pg. 1, §1.1.

17.     The Declaration defines "unit" to mean a part of the condominium property that is subject to exclusive ownership as described in paragraph 3.4 of the Declaration and the "unit owner" as the record owner of legal title to the condominium parcel. *See id*, at pg. 3.

---

[5] Attached to the Underlying Complaint as Exhibit "S" are excerpts of the Declaration of Condominium. Therefore, the Plaintiffs are attaching the complete certified copy of the Declaration of Condominium and they ask that the Court take judicial notice of same.  *See* Fed. R. Evi. 201(b).

18.     The Declaration differentiates the "Common Elements" from "Limited Common Elements." *See id*, at pgs. 5-6.

19.     Common Elements include: "[e]asements through [individual units] for conduits, pipes, ducts, plumbing, wiring, and other facilities that furnish Utility Services…[t]he foundation, load bearing walls, structural slabs, columns, girders, beams, and other components contributing to the support of the building, and exterior walls, doors, windows and glass. .stairways, entrances and exits." ("Common Areas") *See id*, at pgs. 5-6, §3.5.

20.     Limited Common Elements are specifically designated areas that are "for the exclusive benefit of a particular Unit appurtenant to each" designated item.  *See id*, at pg. 6, §3.6.

21.     Pursuant to the Declaration of Condominium, when the Association was created, the Association assumed responsibility for the Common Areas.  *See* Ex. A at pg. 23, §5.1. Specifically, the Association became responsible for the "protection, maintenance, repair and replacement" of the Common Areas except for the Limited Common Elements. *See id*, at pgs. 23-24, §5.

### *Allegations regarding defects of the Project*

22.     In the Underlying Complaint, the Association alleges Portofino is "responsible for the construction defects" within the Project. (Doc. 14-2 at pg. 5, ¶11).

23.     The particular areas alleged to have defects include "common elements…, the roof and structural components of numerous buildings or other improvements, windows, site improvements, openings and/or through wall penetrations, and commonly used facilities." (Doc. 14-2 at pgs. 4, 127, ¶¶5, 216).

24.     Specifically, the Underlying Complaint lists certain  construction defects.  (Doc. 14-2 at pgs. 59-68, 145-153, ¶¶91, 267). The Association generally alleges these defects caused property damage to various areas of the Project including individual units. (Doc. 14-2 at pgs. 59-

68, 145-153, ¶¶91, 267). The Underlying Complaint also attempts to state a cause of action against Portofino related to Portofino's control of the Board of Directors of the Association and damage related to construction of the Project. (Doc. 14-2 at pgs. 68-70, 154-156 at ¶¶94-108, 270-284).

25.     The Underlying Complaint also alleges damage caused by water intrusion and "related deterioration." (Doc. 14-2 at pg. 69, ¶100).

### III.     Insurance Policies

26.     Beginning in December 2008, the Plaintiffs entered into five successive contracts of insurance with Portofino: (1) Policy No.  MP0009006000006, which was in effect from December 22, 2008 to December 22, 2009 ("the 2008 - 2009 Policy"); (2) Policy No. MP0009006000206, which was in effect from December 22, 2009 to December 22, 2010 ("the 2009 – 2010 Policy"); (3) Policy No. MP0009006000574, which was in effect from December 22, 2010 to December 22, 2011 ("the 2010 – 2011 Policy"); (4) Policy No. MP0009006000934, which was in effect from December 22, 2011 to December 22, 2012 ("the 2011 – 2012 Policy"); and (5) Policy No. MP0009006001320, which was in effect from December 22, 2012 to December 22, 2013 ("the 2012 – 2013 Policy") (collectively, the "Policies"). (Doc. 14-1). *See* the Declaration of  Deneen Dallago attached as **Exhibit "B."**

27.     All five Policies contain the following pertinent provisions:

**2.     Exclusions**
This insurance does not apply to:

**j.     Damage to Property**

"Property damage" to:

**(1)**     Property you own, rent or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or

maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

**(2)**  Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises; …

\*\*\*

(Doc. 14-1 at pgs. 25, 71, 117, 167, 217).

### SECTION V – DEFINITIONS

**13.** "Occurrence means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**14.** "Property damage" means:
  **a.** Physical injury to tangible property, including all resulting loss of use shall be deemed to occur at the time of the physical injury that caused it;…

\*\*\*

(Doc. 14-1 at pgs. 35, 81-82, 127-128, 177-178, 227-228).

### *Endorsements*

28.    All five Policies also contain the following endorsement:

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

### Non-Stacking of Limits Endorsement
### Two or More Coverage Forms, Coverage Parts or Policies Issued by Us

This endorsement modifies insurance provided under the following:

ALL COVERAGE FORMS OR COVERAGE PARTS PROVIDING LIABILITY COVERAGE

If any Coverage Form, Coverage Part or Policy issued to you by us or any company affiliated with us apply to the same claim for damages, the maximum Limit of Insurance for Liability Coverage under all of the Coverage Forms, Coverage Parts or Policies shall not exceed the highest applicable Limit of Insurance available under any one Coverage Form, Coverage Part of Policy.

This endorsement does not apply to Coverage Form, Coverage Part or Policy issued by us or an affiliated company specifically to apply as excess insurance over the Policy.

All other terms and conditions of this policy remain unchanged.

(Doc. 14-1, pgs. 10, 56, 102, 152, 200).

29.    All five Policies contain the following Designated Premises Endorsement:

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## LIMITATION OF COVERAGE TO DESIGNATED PREMISES OR PROJECT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

| |
|---|
| **Premises:** |
| [The specific premises designated in each individual Policy are detailed below.] |
| **Project:** |
| [No "project" is designated in any of the five Policies.] |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

This insurance applies only to "bodily injury", "property damage", "personal and advertising injury" and medical expenses arising out of:

**1.** The ownership, maintenance or use of the premises shown in the Schedule and operations necessary or incidental to those premises; or

**2.** The project shown in the Schedule.

(Doc. 14-1 at pgs. 40, 86, 132, and182, 233).

30.    The 2008-2009 Policy lists a premium basis exposure of 104 units for which an annual premium of $5,408.00 was charged to Portofino. (Doc. 14-1 at pg. 14).

31.    The 2009-2010 Policy lists a premium basis exposure of 99 units for which an annual premium of $4,455.00 was charged to Portofino (Doc. 14-1 at pg. 60).

32.    The 2010-2011 Policy  lists a premium basis exposure of  96 units for which an annual premium of $4,320.00 was charged to Portofino.  (Doc. 14-1 at pg. 106).

9

33.    The 2011-2012 Policy lists a premium basis exposure of 88 units for which an annual premium of $3,960.00 was charged to Portofino. (Doc. 14-1 at pg. 154).

34.    The 2012-2013 Policy lists a lists a premium basis exposure of 33 units for which an annual premium of $1,485.00 was charged to Portofino. (Doc. 14-1 at pg. 203).

35.    The five Policies include a business description of either "owned condominium units" or "condominiums." (Doc. 14-1 at pgs. 4, 14, 50, 60, 96, 106, 146, 154 and 203).

36.    The Declarations include a Schedule of Forms and Endorsements that expressly references Form CG 21 44 07 98, the Designated Premises Endorsement. (Doc. 14-1 at pgs. 5, 51, 97, 147, 195).

## MEMORANDUM OF LAW

### I.    Applicable Legal Standards

#### A.    Summary Judgment Standard

"A district court properly grants summary judgment when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." *Hegel v. First Liberty Ins. Corp.*, 778 F.3d 1214, 1219 (11th Cir. 2015). "Because federal jurisdiction over this matter is based on diversity, Florida law governs the determination of the issues on this appeal." *State Farm Fire and Cas. Co. v. Steinberg*, 393 F.3d 1226, 1230 (11th Cir. 2004).

#### B.    Duty to Defend Standard

"Under Florida law, the determination of an insurer's duty to defend falls under the so-called 'eight corners rule,' the name of which refers to the four corners of the insurance policy and the four corners of the underlying complaint." *Addison Ins. Co. v. 4000 Island Blvd. Condo Ass'n*, 721 Fed. Appx. 847, 854 (11th Cir. 2017). Thus, with certain exceptions, the parties are bound by the allegations in the underlying action. *Id.*, quoting *Jones v. Fla. Ins. Guar. Ass'n, Inc.*, 908 So. 2d 435, 442–43 (Fla. 2005).

### C.    Interpretation of Insurance Contracts

"Florida law provides that insurance contracts are construed in accordance with the plain language of the policies as bargained for by the parties." *Auto-Owners Ins. Co. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000). "Because courts assume that the parties intended each provision to be relevant, courts must avoid a construction that does not give all portions of the policy meaning and effect." *International Insurance Co. v. Johns*, 874 F.2d 1447, 1456 (11th Cir. 1989).

## II.    The Designated Premises Endorsement Precludes Coverage

Each of the Policies includes a Designated Premises Endorsement, which states that the "insurance applies only to …'property damage'… arising out of: …the ownership, maintenance or use of the premises….and operations necessary or incidental to those premises." (SMF at ¶29).

Courts, when construing similar provisions, have limited coverage solely to specific locations. For example, in *Union American Ins. Co. v. Haitian Refugee Center/Sant Refijie Ayisyin, Inc.*, 858 So. 2d 1076 (Fla. 3d DCA 2003) the Court not only enforced but explained the purpose of a designated premises endorsement.   In that case, Union American sought a declaratory judgment that it had no duty to defend or indemnify its insured in connection with an incident which involved the shooting death at a street rally sponsored by its insured a mile from the insured's headquarters (the designated premises).   The Court of Appeals reversed the trial court's determination that the policy provided coverage for the incident, determining that a designated premises endorsement similar to the ones in the Mesa Policies precluded coverage. The court observed:

> It is undisputed, although allegedly in part because of the failure of the Center to provide adequate security at the rally, that the wrongful death involved in this case occurred at a location far removed from, and in a manner unrelated to, the Center described in the policy…. In these circumstances and applying the clear language of the policy as we are

> bound to do, we hold, in accordance with the authorities interpreting what amounts to a "designated premises policy" such as this one, that there is no coverage as a matter of law.

*Id.* at 1077-1078 (internal citations omitted). The Court determined the policy at issue, although entitled a commercial general liability policy, was converted into "the equivalent of a premises or owner's, landlord's and tenant's (OL & T policy)" by the Endorsement. *Id.* at 1078, n. 1.

In *Musselwhite v. Fla. Farm Gen. Ins. Co.,* 273 So. 3d 251 (1st DCA 2019), the policy contained a designated premises endorsement with a schedule listing a specific location and with a business description of "FEED/GRAIN/HAY DEALER." *Id* at 252, 256. Upon review, the court enforced the business description in that policy finding that the policy did not provide coverage for well drilling operations that were not necessary or incidental to the business conducted on the premises – a feed store – where the policy described the business as a "FEED/GRAIN/HAY DEALER." The court, after surveying all of the key prior Florida and federal cases discussing the designated premises endorsement, observed that the plain or ordinary meaning of this description is the sale of animal feed and not the insured's drilling operations even though they were conducted from the same premises.

Similarly, here, the plain and ordinary meaning of "owned condominium units," or "condominiums" means the units themselves and losses arising from ownership, maintenance or use of those units; not Portofino's alleged liability as the developer of the project. Accordingly, as was the case in *Musselwhite*, the development and administration of the Project prior to turnover, is not "necessary or incidental" to the ownership of specific units.

The significance of the total premium charged and the reduction of that premium over the five years Mesa insured Portofino also establishes there is no coverage under the Mesa Policies.

In *Parliament Ins. Co. v. Bryant,* 380 So. 2d 1088, 1089 (Fla. Dist. Ct. App. 1980), the court upheld the Designated Premises Endorsement of that insurance policy noting:

> We find that the clear and unambiguous language of the exclusion clause works to provide a limitation of coverage that is, to exclude coverage for situations where the insured was engaged in activities away from the insured's premises. It is undisputed that the accident occurred miles away from the premises; and also since it is evident that the policy we are examining is a premises liability policy, not a general liability policy, and that the very wording of the policy sets out that the premium base was the 5,000 square feet of land upon which the marine company conducted its business, we see no ambiguity. We believe that the appellee has been attempting to convert the policy from a designated premises policy to a general liability policy covering all activities related to boat sales regardless of where and how they occur. In so doing, the court would have to delete not only the exclusionary (or limitation) clause but also crucial wording used in the insuring clause.

*Id.* at 1089.

*See also Certain Interested Underwriters at Lloyd's London, etc. v. Halikoytakis,* No. 8:09-CV-1081-T-17TGW, 2011 WL 1296816 (M.D. Fla. Mar. 31, 2011 (holding that designated premises endorsement of landlord/tenant policy[6] precluded coverage for loss, which occurred on sidewalk across from insured's premises), *aff'd*, 444 Fed. Appx. 328 (11th Cir. 2011); *Home Ins. Co., etc. v. Phillips,* 815 F. Supp. 1471, 1474 (S.D. Fla. Mar. 1993) (holding that premises liability policy did not cover injuries resulting from occurrences outside of the insured premises, "because the actions taken on the premises were not an immediate cause of the defendants' injuries.").

In *Halikoytakis,* the Court noted the relatively small amount of the premium indicated a "restricted risk" for the insurance company. *Id* at *20. Specifically, the Court ruled that the expansive coverage territory language stated elsewhere in the policy was necessarily limited by the inclusion of an endorsement limiting coverage to certain locations as reflected in the relatively small amount of the premium. *See id* at *19-20. Here, each of the Policies contain a Designated Premises Endorsement that

---

[6] The supplemental declarations included a business description which designated a specific address and included a business description as Property Owner/Lessor Risk only. *Id.* at *6. Thus, the policy was not intended to be a CGL policy.

specifically limited the Plaintiffs' risk to the condominium units and property damage that arises out of the ownership, maintenance or use of those units and operations necessary or incidental to those units.. (SMF at ¶29). Further, the decreasing amount of the annual premiums clearly indicates the limited risk undertaken by the Plaintiffs to only those units. (SMF at ¶¶ 30-34). To reach any other result would be contrary to *Musselwhite* and *Halikoytakis*.  *See Musselwhite*, 273 So. 3d 251; *Halikoytakis*, 2011 U.S. Dist. LEXIS 39807 at *20.

The few cases that have not enforced the Designated Premises Exclusion have found policies issued by those insurers in those cases ambiguous and lacking in a clear intention to limit the insurer's exposure.  That is not the case here. Each of the Policies indicates a clear attempt by the parties to limit coverage to certain limited locations and the activities arising from those locations in a number of ways. First, each of the Declarations notes that the business description of Portofino is either: "Owned Condominium Units," or "Condominiums" as opposed to developer or builder. (SMF at ¶35). Second, the Declarations include a Schedule of Forms and Endorsements that expressly references Form CG 21 44 07 98, the Designated Premises Endorsement. (SMF at ¶36). This endorsement supersedes and controls to the extent it conflicts with main policy form.  *Ross Neely Sys., Inc. v. Occidental Fire & Cas. Co.,*  196 F.3d 1347, 1350 (11th Cir. 1999). Third, the Policies were purchased after the Project was completed which is precisely when Portofino first had exposure for losses that could have taken place in completed, but unsold units.  Fourth, the premiums that were assessed annually were tied to the number of units owned by Portofino, which is consistent with the limiting coverage under the Policies to the individual units owned by Portofino and the property damage  arising out of those units. (SMF at ¶¶30-34). Fifth, the amount of the premium clearly reflects the intent of the parties to insure the corresponding number of units and nothing else. For the foregoing reasons,

the Policies demonstrate an unambiguous intention of the contracting parties to limit coverage solely to the designated locations in the Policies -- the individual units still owned by Portofino.

As noted above, the Designated Premises Endorsements mandate that the "property damage" "aris[e] out of" the "ownership, maintenance or use of" the specific locations. (SMF at ¶32). In other words, for coverage to exist, the "property damage" must also arise out of the ownership, maintenance or use of the units specifically owned by Portofino for coverage to exist. It is clear from the underlying allegations that the Association seeks damages from Portofino's role as the developer as opposed to damages arising from the ownership, maintenance or use of the Portofino-owned units.   For example, the Association seeks to hold Portofino liable for damages related to the breach of warranties by the entities that actually performed the work to construct the Project and for the failure to comply with the applicable building codes. (SMF at ¶3). The Association also seeks to recover damages from Portofino related to Portofino's control of the Board of Directors of the Association. (SMF at ¶3). While the Association makes reference to Portofino owning specific units, those allegations do not include any assertions of "property damage" arising from Portofino's ownership, maintenance, or use of those units. (Doc. 14-2 at pg. 74, ¶132).  For instance, in Count I, the Underlying Complaint begins the allegations by stating: "[Portofino] is liable as the developer…," not as an owner of individually designated specific units. (Doc. 14-2 at pg. 68, ¶96). Similarly, Count III states: "[Portofino], by virtue of its control of the board of directors of the Association…" and then proceeds to enumerate ways in which the Association believes Portofino should have acted while Portofino controlled the board of directors. (Doc. 14-2 at pg. 73, ¶127).

For coverage to exist, the Association's claims must arise from the ownership, maintenance or use of the units they owned or operations necessary or incidental to those

specific units. *See Musselwhite*, 273 So. 3d at 254. It stretches credulity to find that Portofino's prior actions as the developer in hiring a general contractor and creating and running that association were in any way related to Portofino's ownership, maintenance and use of units it owned before they were sold. For these reasons, coverage is precluded by the Designated Premises Endorsement and the Court should grant summary judgment in the Plaintiffs' favor.

## III.     In the Alternative the Damage to Property Exclusion Precludes Coverage

If the Court does not apply the Designated Premises Endorsement; the damage to property exclusion precludes coverage to property Portofino owned, rented or occupied.  Under the  Declaration of Condominium,  Portofino owned or occupied the common areas as well as the individual units. When interpreting this exclusion, this District has determined that "[t]he owned  property exclusion is unambiguous" and "specifically excludes coverage for damage to property owned by the named insured." *Nationwide Mut. Fire Inc. Co. v. Cypress Fairway Condo. Ass'n,* Case No.: 6:13-cv-1565-TBS, 2015 U.S. Dist. LEXIS 96196 at *6 (M.D. Fla. Jul. 23, 2015) (finding that Nationwide had no duty to defend their insured for property damage to properties that the insured previously owned and sold after construction).

In *Cypress*, the named insured developed property and subsequently sold the project to another entity. *See id*  at *2.  Subsequent to the sale, the condominium association, on behalf of the owners, filed suit and sought to recover for property damage that predated the sale.  *See id*. Upon review, the Court noted that the subject policies were designed to "cover liability for personal injury or property damage arising out of the policy holder's business activities." *Id* at *1. Further, the Court noted the damage to property exclusion "excludes coverage for damage to property owned by the named insured."  *Id* at *6.  Accordingly, the Court stated that the insurance carrier had no duty to defend or indemnify the named insured for property damage that arose while the insured owned the property.  *See id*.

16

Like the insured in *Cypress,* Portofino previously owned and developed a condominium property that became the subject of a construction defect case. *See Cypress Fairway Condo Ass'n*, 2015 U.S. Dist. LEXIS 96196 at *1; (SMF at ¶¶3-7). The policy language in *Cypress* is identical to the policy language in the Policies. *See id* at *5-6; (SMF at ¶28). Accordingly, this Court should find the property damage exclusion applies and precludes coverage as it is uncontroverted that Portofino owned or occupied the property and that the Association is seeking damages for property damage to repair, restore or maintain that property.

## IV.  There is only One Occurrence

Should the Court find coverage, then the court should also find there is only one occurrence limiting Mesa's exposure to the per occurrence limit of $1 million as opposed to the aggregate limit of $2 million. The Policies define "occurrence" to mean "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  (SMF at ¶30).  Florida follows the "cause theory" when determining the number of occurrences alleged to have occurred.  *See Koikos v. Travelers Ins. Co.,* 849 So. 2d 263, 268 (Fla. 2003). The "cause theory" directs the Court's review to the actual "cause of the injuries, rather than" the effect of the injuries. *Id*.

Here, the cause of the alleged damages is solely related to Portofino's actions as the developer. Although no Florida court has determined the number of occurrences when a developer is sued for construction defects, the court in *Chartis Specialty Ins. Co. v. Am. Constrs. Inc. Co. Risk Retention Group,* No. 3:13-cv-01669, 2014 U.S. Dist. LEXIS 110968 at *12-13 (D. Or. Aug. 12, 2014), applying the cause theory held there is only one occurrence. In *Chartis*, an insurer issued a commercial general liability policy to a developer which defined an occurrence as "'a happening, event, or accident, including continuous or repeated exposure to substantially the same general harmful conditions.'" *Id* at *2. After development of a condominium project,

17

the condominium association sued the developer for property damage, alleging the developers "failed in their duties as developers to build the project free from defects." *Id* at *3. The suit also alleged the association failed to "adequately investigate and ensure that the defects, resultant leaks, and property damage were properly and sufficiently repaired." Like here, there were many alleged defects including, in *Chartis*, problems with the garage, roofs, installation and repair of the concrete waterproofing system and failure to properly construct sufficient control joints. As to each defect, there were also multiple causes. In finding one occurrence the court observed:

> In this case, to find the ultimate facts forming the basis for the settlement, we must look to the allegations in the underlying lawsuit and any evidence developed in defending or supporting those allegations. The allegations themselves assert the cause of the property damage was the Developers' failure to ensure the Meriwether was properly developed, and not that the Developers negligently performed any of the work themselves. The Owners' Association sued only the Developers, and only for their failure as developers and not as contractors or subcontractors. In sum, the only plausible interpretation of the language in the Chartis Policy is that the property damage at the Meriwether Condominium Complex was caused by a single occurrence as a matter of law.

The language of the Chartis policy is identical to the Mesa Policies and the facts of the two cases are remarkably similar. Although the developer in *Chartis* was sued for many defects and its failure to build, maintain and repair the property, all of these acts of alleged negligence were performed in the Chartis' insured's single role of the developer making the immediate cause of the loss to the associations in both cases a singular occurrence -- the failure of the developer to perform its role as the developer. The same is true in this case.

Although the Master Agreement indicates Portofino undertook the development of one project, albeit it in phases, the Master Agreement still contemplated one complex. (SMF at ¶8). Additionally, since each cause of action alleged stems from the one act of Portofino's development of the Project, regardless of the number of phases, there is still one occurrence. (SMF at ¶3); *See, Southern International Corp. v. Poly-Urethane Industries, Inc.,* 353 So. 2d

646, 648 (Fla. 3d DCA 1977) (finding that although a contractor performed work on multiple units, because the units were within the same condominium complex, the one occurrence limit of the contractor's commercial general liability policy applied). Accordingly, just as in *Chartis*, there is one occurrence and if there is coverage, that coverage is limited to the per occurrence limit of $1 million.

## V.      The Non Stacking of Limits Endorsement Limits coverage to One Policy

To the extent coverage exists, the Non-Stacking of Limits Endorsement limits coverage for "the same claim for damages" to the highest applicable limits of liability under any one Coverage Form, Coverage Party, or policy that may apply. (Doc. 14-1, pgs. 10, 56, 102, 152, 200). The definition of the word claim according to *Black's Law Dictionary* (On Line 2d. ed.) is a "legal assertion; a legal demand; Taken by a person wanting compensation, payment, or reimbursement for a loss under a contract, or an injury due to negligence".  Here, there is only one claim by the Association since the Association filed a single suit for payment.

This endorsement, commonly known as an "Anti-Stacking Endorsement," has been upheld in Florida.  *See e.g., Hartford Ins. Co. v. BellSouth Telecomms., Inc.,* 824 So. 2d 234, 238 (Fla. 4th DCA 2002) (holding that an anti-stacking clause in CGL policy was unambiguous, limiting coverage provided by affiliated insurance carriers for the same accident to per accident limit of one million dollars under either policy but not both).

Here the  damages alleged in the Underlying Complaint all stem from the development of the Project. (SMF at ¶19). Regardless of the number of theories of relief raised by the Association, the Association seeks damages arising from the development of the Project. (SMF at ¶3). That is one claim and accordingly, the Court should apply the clear and unambiguous terms of the Anti-Stacking Endorsement and limit the coverage available, should the Court find coverage exists, to only one of the Policies. *See Black's Law Dictionary.*

## VI.     The Subcontractors Owe a Duty to Defend Portofino

On February 15, 2005, Portofino and JGM executed the Master Agreement which included a section that required the subcontractors to indemnify Portofino which included a requirement for the reimbursement of any attorney's fees incurred by Portofino. (SMF at ¶9). Subsequently, JGM executed contracts with each of the Subcontractors. The first paragraph of JGM's contracts with Subcontractors incorporated the Master Agreement and required the Subcontractors to name both Portofino and JGM as additional insureds "with respect to liabilities arising out of the Subcontractor's performance of the work under this Contract…"   These contract documents clearly evidence an intent for liability for "property damage" to be borne by the Subcontractors and by extension their insurance carriers. There is no contrary evidence.

To avail itself of the indemnification provisions contained in the subcontracts, Mesa as Portofino's insurer must show that JGM and the Subcontractors intended to benefit Portofino and by extension its insurer Mesa as third-party beneficiaries. The contracts themselves clearly show such an intent.  The law is clear that incorporation by reference of one agreement naming a party into a second agreement between other parties, is typically sufficient to bestow third-party beneficiary status upon a party. *See FDIC v. Amos,* Case No.: 3:12-cv-548-MCR/EMT, 2015 U.S. Dist. LEXIS 18107 at *28 (N.D. Fla. Mar. 23, 2015) (noting that incorporating a document by reference was sufficient to grant third-party beneficiary status upon a third-party such that the third-party could enforce the contract terms).

The Subcontracts are clear on their face that the parties intended to benefit Portofino as indicated by the direct reference to Portofino and the incorporation of contract terms including those beneficial to Portofino into the Subcontracts. Moreover, the insurance requirements of the Subcontracts directly referenced Portofino and required the Subcontractors to act for the benefit of Portofino by naming Portofino as an additional insured. There is no contrary evidence.

Not only do the Subcontracts indicate an intention to shift liability to the Subcontractors, the insurance requirements and indemnification provisions when read together evidence an intent to shift liability to the Subcontractors' insurance carriers. *See Maplewood Partners, L.P.,* 654 Fed. Appx. 466 at *4-5 (*quoting Aetna Ins. Co. v. Fid. Cas. Co. of N.Y.,* 483 F.2d 471, 473 (5th Cir. 1973) First, in *Maplewood Partners, L.P. v. Indian Harbor Ins. Co.,* 654 Fed. Appx. 466 at *1 (11th Cir. 2016), the purpose of indemnification language in contracts is to shift liability to another party and their insurance carrier when they have insurance); *Travelers Prop. Cas. Co. of Am. V. Amerisure Ins. Co.,* 161 F. Supp. 3d 1133, 1136 (N.D. Fla. 2015) (In determining is someone qualifies an additional insured it is proper to rely upon requirements of a contract deemed to be incorporated into the contract between the general contractor and the subcontractor to interpret the scope of the insurance obtained on the general contractor's behalf).

Here, there is no issue of fact that  JGM and Portofino intended the Subcontractors to bear the liability for property damage they caused. This is established  by the numerous references to Portofino and JGM  in the contract documents. As the insurer of Portofino, Mesa is entitled to judgment in its favor that the Subcontractors must indemnify Portofino.

## CONCLUSION

The insurance policies in this matter are unequivocal – coverage is not available to Portofino.  Alternatively,  should the court find that coverage that coverage  is limited to a single occurrence under one policy.

WHEREFORE, Mesa Underwriters Specialty Insurance company and Montpelier US Insurance Company respectfully request that this Court grant summary judgment in their favor and grant such other relief as the Court deems just and proper.

CASE NO. 3:18-cv-01530-TJC-JRK

HINSHAW & CULBERTSON LLP

/s/ *Siobhan E. P. Grant*
**RONALD L. KAMMER**
Florida Bar No. 360589
rkammer@hinshawlaw.com
**EDWARD T. SYLVESTER**
Florida Bar No. 0051612
esylvester@hinshawlaw.com
**SIOBHAN E. P. GRANT**
Florida Bar No. 68892
sgrant@hinshawlaw.com
2525 Ponce de Leon Boulevard, 4th Floor
Coral Gables, FL 33134
Telephone: 305-428-5118
Facsimile: 305-577-1063

## CERTIFICATE OF SERVICE

I hereby certify that on December 6, 2019, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

/s/ *Siobhan E. P. Grant*
**SIOBHAN E. P. GRANT**

22